

| COMPANY | CUSTOMER |
|---|---|
| Legacy Aviation Group | Stanislav Skrypay and Alina Platonova |

## Key Commercial Terms

| | |
|---|---|
| Start Date | 12/6/21 |
| Term | 12 months, commencing on Start Date |
| Committed Hours | 25 hours |
| Aircraft Class | Light Jet |
| Occupied Hourly Rate | $5,600 per hour |
| Aircraft | Light Jet: Citation CJ2/CJ3, Citation Encore+, Hawker 400XP, Nextant 400XTi, Phenom 300, Learjet 45XR |
| Customer Deposit | Customer agrees to deposit $150,500 into the Company nominated bank account within five (5) business days of the Start Date (the Customer Deposit"). The Customer Deposit and all subsequent deposits are non-refundable, shall never expire and are not subject to annual fees. |
| Federal Excise Tax | Company must collect federal excise tax ("FET") for flights as required by the United States government. FET is charged in addition to the hourly rates. |
| No Interchange Fees | Company will not charge Customer any interchange fees for flights on smaller or larger aircraft. For Alternate Aircraft, Customer shall pay the Alternate Aircraft Rate. |
| Referral Credit | Company will offer a referral credit equal to one Customer Aircraft Class flight hour for each client referred by Customer that purchases a 25 Hour agreement with Company in Customer's Aircraft Class or better. |
| Loyalty Program | At the end of the contract, Company will perform an account review. If company has earned more than 15% on the Customer's account, the difference will be credited as a discount to the Customer's next purchase of 25 or more hours. |

*A.P.*
*SS*
*AB*



## PEAK TRAVEL PERIOD DATES 2021

| Month | 2021 |
|---|---|
| January | 1-5, 14, 17-18 |
| February | 17-18, 21-22 |
| March | 3-4, 6, 10-11, 13, 17-18, 20, 24-25, 27 |
| April | 14-15, 18-19 |
| May | 27, 28 |
| September | 1-2, 6-7 |
| November | 22-23, 27-28 |
| December | 23-24, 26-31 |





# LEGACY AVIATION GROUP
## Acquisition Agreement

This Acquisition Agreement (this "Agreement") is entered into and made legally effective on the Start Date, by and between Legacy Aviation Group ("Company"), and the undersigned customer ("Customer").

In consideration of the promises and of the mutual covenants, agreements, representations, and warranties herein contained, Company and Customer agree as follows:

**Section 1 – Purchase of Hours**

1.1   Purchase by Customer. Customer agrees to purchase the Committed Hours from the Company at the Occupied Hourly Rate. The Occupied Hourly Rate shall be fixed for the Term of the Agreement. The Customer agrees to the following terms and conditions:

1.2   Account.

a.   Purchase. Upon the execution of this Agreement, Customer shall purchase the Committed Hours. Customer may make additional purchases at any time. All deposited funds are non-refundable, shall never expire and are not subject to annual fees.

b.   Set Up. Customer agrees to supply Company with all contact and credit information reasonably requested by Company.

1.3   Flight Booking. To book a flight, the Customer may contact the flight department by e-mail to legacyaviation@legacyaviationgroup.com twenty-four (24) hours per day, seven (7) days per week, three hundred sixty-five (365) days per year.

a.   Authorized Purchasers. Customer shall provide Company with a written list of individuals who are authorized to arrange flights and services for Customer or on the Customer's behalf. Customer may update the list of authorized individuals at any time by providing Company with advanced written notice.

b.   Customer Preference. Customer may request aircraft type or preferred amenities, but Company cannot guarantee to meet all such preferences under the fixed-rate pricing set forth in this Agreement. Should Customer desire to select a specific aircraft type/configuration or seek to accommodate pets, smoking, or excessive luggage which may limit Company's ability to arrange for the appropriate aircraft, Company will provide Customer with a customized quote for such specific aircraft, priced to that individual aircraft rather than using the Occupied Hourly Rate.

c.  <u>Flight Confirmation</u>. Itineraries will be considered confirmed when Customer communicates the desire to book the flight with Company and the booking is confirmed by the flight department via e-mail (membership@legacyaviationgroup.com). Customer will be sent a detailed itinerary for all booked flights. Once a flight is confirmed, cancellation charges may apply. Flights must be booked ninety-six (96) hours prior to any scheduled departure to obtain the Occupied Hourly Rate for flights within 100 nautical miles of the Continental United States. Flights to or from Other Locations must be booked one hundred twenty (120) hours prior to departure. Company will provide alternate pricing for flights booked inside these time frames and all such flights are subject to availability.

d.  <u>Peak Period Travel Dates</u>. Flights on Peak Period Travel Dates are subject to the following limitations:

(i)  Flights must be booked at least one hundred twenty (120) hours prior to departure time;

(ii)  Departure time requests are honored within +/- three (3) hours of requested departure time;

(iii)  One hundred percent (100%) cancellation fee applies to all confirmed flights upon booking during Peak Period Travel Dates.

(iv)  Flights occurring on Peak Travel Dates shall incur a premium of 1.25x the Occupied Hourly Rate.

e.  <u>Catering</u>. Standard aircraft stock (snacks and beverages) are included on all flights arranged by Company at no additional charge to Customer, and any additional special items may be ordered at Customer's expense, subject to market availability and the suitability of the aircraft's equipment (i.e. oven, microwave, etc.). Company will review all catering options with the Customer at time of booking.

1.4  General Pricing Information.

a.  <u>Pricing Region</u>. "Continental United States" rates will apply for itineraries that both originate and terminate entirely within 100 nautical miles of the Continental United States border. Itineraries that either originate or terminate within 100 nautical miles of the Continental United States border but terminate or originate at the other end of the itinerary outside 100 nautical miles of the Continental United States or that both originate and terminate outside 100 nautical miles of the Continental United States are subject to availability and the Occupied Hourly Rate will not apply.

b.  <u>Flight Times</u>. Customer will always be charged utilizing estimated flight times, departure to destination, plus twelve (12) minutes of taxi time per flight segment.



1.5   Calculation of Rates.

a.   Flight Time Minimums. Customer shall be billed for a minimum of one (1) hour of flight time for each flight segment, exclusive of taxi time, and a minimum of 2 hours of flight time for each twenty-four (24) hour period, exclusive of taxi time.

b.   Overnight Charges. Overnight charges are listed in Schedule 1 hereto and will not apply to One-Way flights.

1.6   Cancellation Policy.

Some flights require significant planning prior to the date of the departure under which costs are incurred by Company. Under such circumstances, the undersigned agrees to be responsible for the actual costs incurred by Company in preparation for the trip in addition to any cancellation policy that may apply. Such costs may include, but are not limited to: aircraft handling services, international permits, airline tickets and crew hotel rooms.

a.   Continental United States Cancellation Fees: All flights cancelled within seventy-two (72) hours of the scheduled departure time will be subject to a one hundred percent (100%) cancellation fee equal to the quoted cost of the trip.

b.   International Cancellation Fees: All flights cancelled within one hundred twenty (120) hours will be subject to a one hundred percent (100%) cancellation fee equal to the quoted cost of the trip.

1.7   Security Concerns. A cancellation fee in the amount of one hundred percent (100%) will apply in the event a flight is affected by any security concerns caused by the Customer or its passengers.

1.8   No Show Policy. A "no-show" will be charged the full amount of the flight. If the Customer is one (1) hour late from the scheduled departure time as per the itinerary and has not notified Company, it shall be considered a "no-show," and Company reserves the right to depart and the no-show policy shall be enforced. If the Customer notifies Company within one (1) hour after the scheduled departure time to notify Company of a delay, Company may grant an extension of time, and that new delayed departure time will be the new "scheduled" departure time. Company will make every effort to accommodate the new "scheduled" departure time but cannot guarantee the completion of the flight due to crew duty or scheduling issues which may arise. Cancellation charges and or crew travel/overtime charges may apply.

1.9   Trip Related Expenses. The following types of trip-related expenses will be invoiced by Company to Customer at cost.

    a.    In-flight phone calls made by Customer;

    b.    International airspace, airport, ramp, hangar, or parking fees;

    c.    De-icing services;

    d.    Customs and immigration charges, federal/national and state/province/local excise and or other taxes or VAT, international fees, costs and expenses, and any user charges that may be imposed by any governmental authority (e.g., high-density airport fees, airport landing fees, and ramp or parking fees); and

    e.    Any extraordinary charges associated with the transportation of medical patients, or any other additional charges which are incurred at the specific request of or for the specific needs of the Customer.

    f.    Ground transportation arranged by Company;

    g.    Supplemental crew expenses required to fulfill Customer's requested itinerary;

    h.    Other services requested by Customer;

    i.    <u>Other Fees/Charges</u>. Notwithstanding the foregoing, there are no additional charges with respect to aircraft servicing and maintenance, aircraft repositioning or Customer-controlled delays of less than sixty (60) minutes. Company reserves the right to charge Customer to repair any damage to the aircraft or for any excessive cleaning of the aircraft, to the extent that either may have been caused by Customer or the Customer's guests.

1.10    <u>Operational Limitations</u>. All flights that require a departure or landing slot, airport parking approval, government permit, extended airport hours or other permission beyond Company's control will be available subject to availability. Company will always strive to meet the itinerary of Customer's choice, but may be forced to use an alternate airport or offer alternate departure/arrival times due to circumstances beyond its control. Flights into or out of some locations may exceed the performance characteristics of a given class of aircraft (short runway, extreme altitude, etc.) and necessitate Customer selection of another aircraft class or customized pricing based upon a specific aircraft rather than by aircraft class.

1.11    <u>Operation of Air Transportation Services</u>. Customer acknowledges that the air transportation services that it will purchase pursuant to this Agreement may ultimately be operated by Company or by a Company-approved air carrier vendor. The carrier that operates each charter flight for Customer will have responsibility for the safety of the passengers, crew, and aircraft. Accordingly, the operating carrier may delay, terminate, or divert any flight if the carrier, in its sole discretion, determines that such action is necessary for safety or compliance with regulations, and neither Company nor a Company-approved vendor will have any liability

to Customer for any such delay, termination, or diversion.

1.12 <u>Pets</u>. Customer is required to notify Company if any pets may be traveling with them at the time a quote is requested. Should a Customer fail to notify Company in advance that pets are traveling with them, Company reserves the right to cancel a Customer's flight and applicable cancellation charges shall be due and payable. Due to limited availability of aircraft that permit pets, itineraries including pets cannot be guaranteed under this Agreement and each charter flight inclusive of pets will be quoted uniquely and shall be subject to availability of suitable aircraft.

1.13 <u>Luggage</u>. Customer is required to notify Company of its luggage requirements at the time of booking. If an aircraft is booked with the maximum amount of passengers and luggage, this may impact the aircraft performance capabilities (range, fuel stops, required runway length, etc.) which may force Customer to accept alternate plans or to pay for a larger aircraft. Company may require excess luggage to be shipped separately based upon the capacity limitations of the aircraft, and any such shipping would be at Customer's sole expense.

1.14 <u>Identification and Travel Documentation</u>. Customer and all passengers will be required to have specific identification and/or documentation when traveling. For identification and documentation requirements please refer to Schedule 2 "Required Travel Identification and Documents" hereto. Should Customer fail to provide required documentation or identification, for all passengers Company reserves the right to refuse carriage for any passenger or cancel a Customer's flight and cancellation charges shall apply.

**Section 2 – Representations, Warranties, and Covenants**

2.1 <u>Mutual Representations, Warranties, and Covenants</u>. Each party represents, warrants, and covenants that:

a. It is now, and will remain a business entity of the type specified in the signature block below, organized under the laws of the jurisdiction specified in the signature block below, and at all times in good standing as a business entity in such jurisdiction;

b. It has the right, power, and authority to enter into this Agreement, and the officer executing this Agreement on its behalf is duly authorized to do so; and

c. By executing this Agreement or performing the obligations contemplated in this Agreement, it will not breach any agreement between itself and a third party.

2.2 <u>Additional Representations, Warranties, and Covenants of Customer</u>. Customer further represents, warrants, and covenants that it will (a) purchase air transportation services under this Agreement only for the purpose of the carriage of persons who are shareholders, directors, officers, employees, or guests of the Customer and (b) do so without requiring or

receiving from such persons any reimbursement for the cost of such transportation, except as permitted by law.

### Section 3 – Payments

3.1   Method of Payment. All payments made pursuant to this Agreement shall be made using United States currency, and shall be made by wire transfer made payable to the order of Pinnacle Management Group LLC and delivered to:

| | |
|---|---|
| Bank: | Chase Bank |
| | 1450 Brickell Avenue |
| | Miami Fl 33131 |
| | |
| Routing: | 2 6 7 0 8 4 1 3 1 |
| Account: | 3 7 5 2 0 5 8 0 1 |
| SWIFT: | C H A S U S 3 3 |
| | |
| Beneficiary: | Pinnacle Management Group LLC |

3.2   Credit Cards. Use of a credit card for payment is subject to express pre-authorization and approval of Company.

3.3   Account Balance. If Customer's Account balance is less than the estimated amount of a pending or requested flight, Company must receive an additional deposit into Customer's Account prior to booking the flight. Deposit must be received at least ninety-six (96) hours prior to any flight.

   a.   Company shall have the right, in its sole discretion, to apply any funds which may be available in Customer's Account to any outstanding amounts owed to Company by Customer.

   b.   In the event of a billing dispute, Customer agrees to promptly pay any undisputed amounts while Company and the Customer use reasonable efforts to resolve any differences of opinion related to the invoice.

   c.   Failure by Customer to pay any outstanding amounts within ten (10) days after they are due and payable shall result in the imposition of a late payment penalty in the amount of five percent (5%), and an additional charge in the amount of one and one-half percent (1.50%) per month thereafter, or the maximum interest allowed by law, whichever is less. Company also shall be entitled to reimbursement by Customer for all reasonable costs (including collection agency and or attorneys' fees and costs) that Company may incur in seeking to collect any outstanding amounts due from Customer.

### Section 4 – Insurance and Liability Limitations

4.1 <u>Insurance Coverage</u>.

a. Company will maintain aircraft liability insurance coverage with a combined single limit (including bodily injury to passengers and property damage) of not less than one hundred million dollars ($100,000,000) per occurrence and personal injury coverage of twenty-five million dollars ($25,000,000) in the aggregate. Coverage includes flights operated by Company's approved charter air carrier vendors.

b. Upon request by Customer, as charter trips are arranged for operation by Company or by an Company-approved vendor air carrier, Company will provide, or arrange for the provision of, a certificate of insurance evidencing the coverage amounts required pursuant to this Agreement, plus the following:

(i) The Customer and its directors, officers, employees, and agents are named as Additional Insureds.

(ii) The policy contains a "Severability of Interest" clause stating that each person or entity insured under the policy is covered separately, subject to the limit of liability any one (1) occurrence regardless of the number of insureds under the policy.

(iii) The policy contains an "Invalidation Clause," a "Primary and Non-Contributory" clause, and a waiver of subrogation clause in favor of Customer.

(iv) Except as provided for in the next paragraph, the policy will provide for Customer to be given at least the minimum statutory required notice for cancellation or material changes to the policy but notice may not be less than thirty (30) days.

c. Customer acknowledges that the availability and cost of "War, Hi-Jacking & Other Perils Exclusion Clause Write Back Endorsement" for Aircraft Liability and Aircraft Physical Damage Coverage for aircraft physical damage, for passenger liability, and for combined single limit liability coverage and third party liability could change with little or no notice, depending on global, national, or local circumstances entirely out of Company's or an Company-approved vendor air carrier's control.

4.2 <u>Disclaimer of Liability</u>. THE PARTIES AGREE THAT UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER UNDER THIS AGREEMENT FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR DIMINUTION OF VALUE FOLLOWING LOSS IN CONNECTION WITH THE PERFORMANCE OF THIS AGREEMENT, WHETHER IN CONTRACT OR TORT (INCLUDING STRICT LIABILITY AND NEGLIGENCE) SUCH AS BUT NOT LIMITED TO LOSS OF REVENUE, LOSS OF USE, OR ANTICIPATED PROFITS.

4.3    Liability Limitations in Contracts. THE PARTIES ACKNOWLEDGE THAT THEIR RESPECTIVE LIABILITIES AND RIGHTS MAY BE FURTHER LIMITED IN ANY FUTURE AGREEMENT INTO WHICH THEY ENTER, AND THE LIABILITY LIMITS IN SUCH CHARTER TRIP CONTRACTS SHALL BE SUPPLEMENTARY AND ADDITIONAL TO THE LIMITS PROVIDED IN THIS AGREEMENT. SUCH ADDITIONAL LIMITS MAY INCLUDE (WITHOUT RESTRICTION) LIMITATIONS UNDER THE WARSAW CONVENTION, LIMITATIONS ON LIABILITY FOR FLIGHT CANCELLATIONS, DELAYS AND DIVERSIONS, AND LIMITATIONS FOR DAMAGES TO VALUABLES OR FRAGILE ITEMS.

**Section 5 – Confidentiality**

5.1    Receipt of Confidential Information. Both parties ("Receiving Parties") acknowledge that they will receive nonpublic information regarding each other that the other party ("Disclosing Party") deems confidential ("Confidential Information"). Without limitation, such Confidential Information may include information in tangible or intangible form relating to or including the following:

   a.    The terms of this Agreement, and

   b.    Customer's and its affiliates' business policies, plans, practices, personal information and or travel itineraries.

5.2    Exclusion from Confidential Information. Confidential Information shall not include any information that is or subsequently becomes publicly available without the Receiving Party's breach of an obligation owed to the Disclosing Party.

5.3    Obligations to Protect Confidential Information. As to the Confidential Information, the Receiving Party shall:

   a.    Take reasonable security precautions, as least as great as the precautions the Receiving Party takes to protect its own confidential information, but no less than reasonable care, to keep confidential the Confidential Information; and

   b.    Refrain from disclosing any Confidential Information to third parties, except as reasonably required in the performance of the Receiving Party's obligations under this Agreement, or as required by law (provided that the Receiving Party gives the Disclosing Party reasonable notice prior to such disclosure to allow Disclosing Party a reasonable opportunity to seek a protective order or equivalent).

5.4    Handling of Unauthorized Disclosures. The Receiving Party shall notify the Disclosing Party immediately upon discovery of any unauthorized use or disclosure of

Confidential Information by the Receiving Party, and must cooperate with the Disclosing Party in every reasonable way to help the Disclosing Party regain possession of the Confidential Information and prevent further unauthorized use or disclosure.

5.5   Equitable Relief. Receiving Party acknowledges that monetary damages may not be a sufficient remedy for unauthorized disclosure of Confidential Information and that the Disclosing Party shall be entitled, without waiving any other rights or remedies, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction. If the Disclosing Party employs attorneys to enforce any rights arising out of or relating to this section and prevails in its claim, the Disclosing Party shall be entitled to recover reasonable attorney's fees and costs from the Receiving Party.

**Section 6 – Miscellaneous Provisions**

6.1   Amendment. No amendment or waiver of this Agreement will become effective unless it is in writing and duly signed by the parties hereto.

6.2   Assignment.

a.   Neither party may assign its rights or responsibilities under this Agreement without the prior written consent of the other party, which consent may not be unreasonably withheld or delayed. Any attempted assignment not approved by the other party, as provided in this section, shall be null and void.

b.   Notwithstanding the requirements of Section 6.2.a. above, either party may assign its rights and obligations under this Agreement, in whole or in part, after providing advance written notice to the other party, but without having to obtain the other party's prior written consent: (i) to a parent, affiliate, or subsidiary; or (ii) to the surviving entity resulting from a merger with Customer or from the sale of substantially all of Customer's assets and business. Additionally, subject to Customer's approval, Company may arrange for flights to be performed by one (1) or more Company-approved vendor air carriers.

c.   Any assignment made in accordance with this section will relieve the assigning party from any further rights or obligations under this Agreement, so long as the assignee agrees in writing to assume all such rights and obligations.

d.   Subject to the foregoing, the terms and conditions of this Agreement shall be binding upon and inure to the benefit of Customer and Company and their respective successors and permitted assigns.

6.3   Computation of Time. Unless otherwise specified in this Agreement, all references to the number of days within which something will occur or must be made to occur shall be deemed to refer to calendar days.

6.4   Counterparts. This Agreement may be executed in one or more counterparts, all of which together shall constitute the executed Agreement.

6.5   Dispute Resolution. In the event of any dispute or controversy between the Parties relating to this Agreement (other than a dispute or controversy seeking injunctive or equitable relief), the matter shall be submitted to arbitration for resolution, which arbitration shall be conducted in Miami, Florida, before one arbitrator, in accordance with the rules of the American Arbitration Association (Commercial) then in effect. The decision of the arbitrator shall be binding on all parties, and judgment upon the award or arbitration rendered by the arbitrator may be entered in any court having jurisdiction. The arbitrator shall limit its judgment to the matters permitted to be submitted to it under the express terms of this Agreement. The expense of the arbitrator shall be borne equally among the parties to the dispute, and the arbitrator shall identify which parties are so obligated should there be a dispute as to same.

6.6   Entire Agreement. This Agreement contains the entire understanding between the Parties with respect to the subject matter herein and supersedes all previous communications, representations, and agreements, whether oral or written, between the Parties.

6.7   Force Majeure. Neither Party shall be liable for any failure or delay in performance under this Agreement to the extent said failures or delays are proximately caused by causes beyond that Party's reasonable control and occurring without its fault or negligence, provided that, as a condition to the claim that a party is not liable, the Party experiencing the difficulty shall give the other prompt written notice, with full details following the occurrence of the cause relied upon. This Agreement may be terminated immediately by either Party giving written notice to the other, if a force majeure condition lasts more than thirty (30) calendar days.

6.8   Further Assurances. Each Party hereto shall execute and deliver all such further instruments and documents as may reasonably be requested by the other Party in order to fully carry out the intent and accomplish the purposes of this Agreement as well as to comply with any change in any applicable law.

6.9   Governing Law. This Agreement shall be governed by, interpreted, and construed in accordance with the laws of the State of Florida, excluding its choice of law and conflict of laws provisions.

6.10   Independent Contractor. The relationship between Company and Customer shall be deemed to be that of an independent contractor and customer. There is no partnership or joint venture intended between Company and Customer.

6.11   Notices. All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be sent by fax (with the sender's facsimile machine confirming transmission and a copy of the notice delivered by Federal Express, certified

mail, return receipt requested) and shall be deemed to have been duly given (a) one (1) day after being sent, if sent by 5:00 P.M., Miami local time on a business day, or (b) the next business day if sent at any other time.

> Dieterich & Associates
> Attn: Christopher Dieterich, Esq.
> 11835 West Olympic Boulevard, Suite 1235
> Los Angeles, California 90064
> Phone:   + 1 310.312.6888
> Fax:     + 1 310.312.6680

With a copy to: (which does not constitute notice)

> E-mail: legacyaviation@legacyaviationgroup.com

6.12   Severability. In the event that any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable provision, which, being valid, legal and enforceable, comes closest to the intention of the parties underlying the invalid, illegal or unenforceable provision.

6.13   Survival. When the Term of this Agreement ends, the Parties will retain all rights and obligations that they had accrued under this Agreement up to that time. Additionally, the following sections of this Agreement will survive beyond the end of the Term of this Agreement: 4.2, 4.3, 5.1, 5.2, 5.3, 5.4, 5.5, 6.5, and 6.9.

6.14   Third-Party Beneficiaries. There are no intended third-party beneficiaries to this Agreement.

[SIGNATURE PAGE FOLLOWS]





The Parties have executed this Acquisition Agreement, effective as of the date first above written.

**COMPANY**

By: _____

Name: _Andrew Brown_____

Title: _Authorized Signatory_

**CUSTOMER:**

By: _____        By: _____

Name: _Skrypay Stanislav___        Name: _Platonova Alina___

Passport: _FG 772941_____        Passport: _FG 772642_____

Address: _Ukraine Kharkov-city, Potebny str 6, ap 23_

Phone: _+380675713883_____

E-mail: _skripay2004@mail.ru_

## SCHEDULE 1 - DAILY OVERNIGHT FEES 2021

| Regions | Light | Mid | Super-mid | Large | Heavy |
|---|---|---|---|---|---|
| Continental US | $700 | $750 | $800 | $1,050 | $1,200 |
| Other Locations | $1,100 | $1,200 | $1,275 | $1,650 | $1,775 |



## SCHEDULE 2 - REQUIRED TRAVEL IDENTIFICATION AND DOCUMENTS 2021

Identification – United States

As required by federal law, all passengers older than eighteen (18) years of age must present to crew members prior to departure of every flight at least one (1) form of photo identification issued by a local, state or federal government agency, such as a driver's license or passport. Such documentation is required of all passengers on all charter flights regardless of departure or destination. Copies are not valid forms of identification.

Identification – International

When traveling internationally, all passengers including children, lap babies and infants must carry a valid passport on board the aircraft. This includes all destinations in Canada, Bermuda, the Caribbean and Mexico. Company will require complete and valid passport information for each passenger at least 72 hours prior to departure. Passports must be valid for the entire length of the trip.

Some destination countries may require a visa or other permit for entry depending upon each country's regulations and the passenger's country of residence. Company will assist Customer in identifying visa requirements and deadlines. Further information may be obtained from the State Department.

Minors

Minors traveling outside the United States without either custodial parent/guardian require a signed and notarized letter from the absent custodial parent(s) authorizing travel of the minor. If neither parent is traveling with the minor, both parents must complete and sign this form. In cases of sole custody, legal proof of sole guardianship is required. The required consent letter is shown as the last page of this document and additional copies can be provided upon request. Alternate forms of this document may not be substituted. Consent letter may be provided to Company and kept on file for future use.

Company reserves the right to refuse to complete any trip where passengers do not possess proper identification or documentation and applicable cancellation charges may apply.

# ADDENDUM A